UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TRACEY ARCEMENT, ET AL.                    CIVIL ACTION

VERSUS                                     NO: 13-5436

GEOVERA SPECIALTY INSURANCE                SECTION: R(4)
SERVICES, INC.

ORDER AND REASONS

Before the Court is defendant Geovera Specialty Insurance Services, Inc.'s renewed motion for judgment as a matter of law or, in the alternative, motion to amend the judgment.   For the following reasons, the Court denies the motion for judgment as a matter of law and grants the motion to amend the judgment.

I. Background

This case is a dispute about whether GeoVera paid plaintiffs Tracey and Lori Arcement the amounts owed under their homeowner's insurance policy for damages their property suffered during Hurricane Isaac.

The Arcements held a homeowner's insurance policy issued by GeoVera, which provided $299,000 in dwelling coverage, $29,900 in other structures coverage, and $149,500 in personal property coverage.   A 3% windstorm/hail deductible of $8970 applied to this coverage.   The policy provided various exclusions, including an exclusion for water damage, which is defined in relevant part as

"[f]lood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind...."[1]  The policy also contains an anti-concurrent causation ("ACC") clause applicable to all exclusions.  It provides: "We do not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss."[2]

The Arcements held federal flood insurance through a different carrier from which they received $350,000, the limit of their coverage, for flood damages: $250,000 for damage to their home and other structures and $100,000 for damage to the home's contents.  The flood adjustor, Christopher Stratton, inspected the Arcements' home on September 6, 10, and 14, 2012.  He provided a replacement cost value estimate for the Arcements' property as follows: $358,883.96 for the structures ($331,360.46 for the home and $27,523.50 for the garage) and $165,847.93 for the contents of the home.  To receive these funds, the flood insurer required the Arcements to sign a proof of loss document in which the Arcements agreed that flooding caused the covered damages.

The Arcements also made a claim with GeoVera on August 29, 2012 for wind and rain damage.  On September 29, 2012, GeoVera claim representative, Kiarra Rainey, sent the Arcements a letter

---

[1]     Defense Ex. 2 at 130.

[2]     *Id.* at 129.

outlining GeoVera's evaluation of damages, which specified roof damages of $11,911.57, less depreciation of $2101.76, less the applicable deductible of $8970.00, totaling a payment to the Arcements of $839.81.  The letter stated that GeoVera "determined that there is no coverage for the damages claimed below the flood line."[3]  The Arcements requested a reinspection of certain areas of the home above the flood line.  GeoVera had the property reinspected and, in a letter dated October 15, 2012, denied coverage for any additional damages because the "items were either below the flood line/water line of 11ft 2 in, or not visually damaged."[4]

The Arcements hired an "independent adjustor," Don Kotter, who opined that their property suffered wind- and rain-related damages separate from flood damages totaling $198,018.13 in replacement cost value or $178,451.38 in actual cash value.  Specifically, Kotter identified numerous damages to the home, contents, and other structures sustained as a result of wind and rain, independently of any flooding.

The Arcements sued GeoVera, claiming that it wrongfully denied coverage for the wind and rain damage that their property sustained.  The Court held a jury trial on July 14-16, 2014.  At the close of the Arcements' evidence and again at the close of all

---

[3]    Plaintiffs' Ex. 10 at 017-100.

[4]    *Id.* at 017-095.

evidence, the Court denied the majority of GeoVera's motions for judgment as a matter of law.[5]  After a few hours of deliberation, the seven-person jury returned a verdict in favor of the plaintiffs, awarding them $70,000 for wind and rain damage to their dwelling, $10,000 for wind and rain damage to the contents of their dwelling, and $200 for wind and rain damage to other structures on their property.  In addition, the jury awarded $5000 in penalties under La. Rev. Stat. § 22:1973(B)(6) based on its finding that GeoVera relied exclusively on the flood water mark in determining coverage.

Geovera has renewed its motions for judgment as matter of law on two issues: (1) it argues that there was no evidentiary basis for the jury to find that the ACC clause did not apply to exclude all claims, and (2) it argues that there was no evidentiary basis for the jury to find that GeoVera used only the flood water mark, without considering other evidence, in determining coverage.[6]  In the event that its motion for judgment as a matter of law is denied, GeoVera moves in the alternative for the Court to amend the judgment to reduce the award of the jury under the dwelling portion of the GeoVera policy from $70,000 to $69,448.89 to reflect a

---

[5]     The Court granted GeoVera's motion for judgment as a matter of law on the issue of whether GeoVera was in bad faith by not paying the Arcements' claim within 30 days.

[6]     R. Doc. 58.

proper calculation of replacement cost value.[7]

## II. Legal Standard

### A. Judgment as a Matter of Law

The Court will grant judgment as a matter of law under Rule 50 only when the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable jurors could not arrive at a different verdict. *Arsement v. Spinnaker Exploration Co., L.L.C.*, 400 F.3d 238, 248-49 (5th Cir. 2005). The Court will consider all of the evidence, and draw factual inferences in favor of the verdict. *DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 427 (5th Cir. 2003). The Court, however, leaves credibility determinations, the weighing of the evidence, and the drawing of all legitimate inferences from the facts to the jury. *Id.* A mere scintilla of evidence, however, "'is insufficient to present a question for the jury'" as "'there must be a conflict in substantial evidence to create a jury question.'" *Id.* (quoting *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 804 (5th Cir. 1997)). The Fifth Circuit defines substantial evidence as "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Transoil (Jersey) Ltd. v. Belcher Oil Co.*, 950 F.2d 1115, 1118 (5th Cir. 1992). Therefore, a jury verdict

---

[7]     *Id.*

must be upheld unless "the facts and inferences point so strongly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969). The Court assumes that the jury followed its instructions when weighing the evidence. *See United States v. Webster*, 162 F.3d 308, 324 (5th Cir. 1998).

### B. Motion to Amend a Judgment

The Court has considerable discretion to grant or to deny a motion to alter or amend the judgment under Rule 59(e). *See Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*, 6 F.3d 350, 355 (5th Cir. 1993). The Court, however, must "strike the proper balance between the need for finality and the need to render a just decision on the basis of all the facts." *Id.* at 355. Courts in this district hold that a moving party must satisfy at least one of the following criteria to prevail on a Rule 59(e) motion: (1) the motion is necessary to correct a manifest error of fact or law; (2) the movant presents newly discovered or previously unavailable evidence; (3) the motion is necessary in order to prevent manifest injustice; or (4) the motion is justified by an intervening change in the controlling law. *See Scordill v. Louisiana Ladder Group, L.L.C.*, NO. CIV. A. 02-2565, 2004 WL 1118302, at *3 (E.D. La. May 18, 2004).

6

## III. Discussion

### A. Judgment as a Matter of Law

#### 1. Application of the Anti-Concurrent Clause

##### i. Introduction

The Arcements' policy with GeoVera excludes coverage for water damage, defined as "[f]lood, surface water, waves, tidal water, overflow of a body of water, or spray form any of these, whether or not driven by wind...."[8]  In contrast, the policy provides coverage for damage caused by wind and rain.   The policy also contains an ACC clause, which provides:

> We do not insure for loss caused directly or indirectly by any of the following [exclusions].  *Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.*  These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.[9]

In other words, the policy excludes coverage for a covered peril (wind or rain) whenever an excluded peril (flood) contributes concurrently or in any sequence to the loss.   GeoVera now argues that the policy's ACC clause operates to exclude coverage for all claims because any areas or items of the plaintiffs' property that were damaged by wind or rain were also damaged by flood.

##### ii. Law Governing ACC Clauses

---

[8]     Defense Ex. 2 at 130.

[9]     *Id.* at 129.

7

Louisiana law governs this contractual dispute. *See Arctic Slope Regional Corp. v. Affiliated FM Ins. Co.*, 564 F.3d 707, 709 (5th Cir. 2009). Under Louisiana law, "an insurance policy is a contract that must be construed in accordance with the general rules of interpretation of contracts set forth in the Louisiana Civil Code." *Coleman v. Sch. Bd. of Richland Parish*, 418 F.3d 511, 516 (5th Cir. 2005) (quoting *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 262 (5th Cir. 2003)). While the Louisiana Supreme Court has not provided guidance on the correct application of an ACC clause to the facts of this case, both the Fifth Circuit and at least one Louisiana appellate court have.

The Fifth Circuit, applying Mississippi law, first addressed the impact of an ACC clause in *Leonard v. Nationwide Mut. Ins.*, 499 F.3d 419 (5th Cir. 2007). At the time, Mississippi courts had not addressed the issue, so the Fifth Circuit made an "*Erie*-guess" as to how Mississippi courts would decide the issue. *Id.* at 431. There, a home was damaged primarily by storm-surge and by wind to a lesser extent. *Id.* at 426. The homeowner's insurance policy covered wind damage, but excluded water damage. *Id.* at 424. The policy also contained an ACC clause, which excluded damage caused concurrently or in any sequence by an excluded peril. *Id.* at 425. After a trial, the district court awarded damages only for those losses caused exclusively by wind. *Leonard v. Nationwide Mut. Ins.*, 438 F. Supp. 2d 684 (S.D. Miss. 2006). Specifically, the

8

district court awarded damages for a hole in a ground-floor window likely caused by a wind-driven object, as well as for cleaning and repairing exterior walls damaged exclusively by wind and above the flood line. *Id.* at 696. In doing so, the district court held that the ACC clause was ambiguous and unenforceable. *Id.* at 693-94. On appeal, the Fifth Circuit affirmed the district court's judgment, but clarified the correct interpretation of the ACC clause. First, the Fifth Circuit held that the ACC clause was unambiguous and enforceable. *Leonard*, 499 F.3d at 430. Second, the Fifth Circuit applied the ACC clause to the facts at issue, noting that there were three species of damage at issue: "(1) damage caused exclusively by wind; (2) damage caused exclusively by water; and (3) damage caused by wind 'concurrently or in any sequence' with water." *Id.* The court instructed that "[t]he only species of damage covered under the policy is damage caused *exclusively* by wind. But if wind and water synergistically caused the *same* damage, such damage is excluded." *Id.* at 430. According to the court, "[t]he classic example of such a concurrent wind-water peril is the storm-surge flooding that follows on the heels of a hurricane's landfall." *Id.* Clarifying when coverage exists under the policy, the Fifth Circuit stated:

> If, for example, a policyholder's roof is blown off in a storm, and rain enters through the opening, the damage is covered. Only if storm-surge flooding--an excluded peril--then inundates the *same* area that the rain damaged is the ensuing loss excluded because the loss was caused concurrently or in any sequence by the action of a

covered and an excluded peril.

*Id.* at 431.   In other words, the Fifth Circuit instructed that when a covered peril first causes a loss, and an excluded peril then damages the same area, coverage is excluded under the ACC clause.

Again applying Mississippi law, the Fifth Circuit next addressed the issue in *Tuepker v. State Farm Fire & Ins. Co.*, 507 F.3d 346 (5th Cir. 2007).   In *Tuepker*, the Fifth Circuit, interpreting the effect of an ACC clause under Mississippi law, stated:

> [A]ny damage caused exclusively by a non-excluded peril or event such as wind, not concurrently or sequentially with water damage, is covered by the policy, while all damage caused by water or by wind acting concurrently or sequentially with water, is excluded.   Thus, the ACC Clause in combination with the Water Damage Exclusion clearly provides that indivisible damage caused by both excluded perils and covered perils or other causes is not covered. However, ... if wind blows off the roof of [a] house, the loss of the roof is not excluded merely because a *subsequent* storm surge later completely destroys the entire remainder of the structure; such roof loss occur[red] in the absence of [an excluded peril].

507 F.3d at 354.   The ACC Clause in *Tuepker*, while similar to that in *Leonard*, contained the following additional language: "We do not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events."   *Id.* at 351.   The court noted this difference, but specified that this language did not "significantly differentiate the clause from the ACC Clause at issue in *Leonard*."   *Id.* at 354.

The Fifth Circuit's "*Erie* guess" on Mississippi law was

10

ultimately rejected by the Mississippi Supreme Court.  In *Corban v. U.S. Automobile Ass'n*, the Mississippi Supreme Court addressed the effect of ACC Clauses under Mississippi law.  20 So. 3d 601 (Miss. 2009).  There, the ACC clause at issue provided: "We do not insure for *loss* caused directly or indirectly by any of the following. Such *loss* is *excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.*"  *Id.* at 612.  The court held, as later recognized by the Fifth Circuit, that

> the ACC clause in practice only excludes loss that was "concurrently" caused by water, not loss that was caused "in any sequence" by water.  In other words, when water and another cause operate indivisibly to create damage, the loss is excluded; but when water and another cause act in sequence, the damage caused by water is excluded and the damage from the other cause is covered.

*Penthouse Owners Ass'n v. Certain Underwriters at Lloyds*, 612 F.3d 383, 387 n.1 (5th Cir. 2010) (explaining the holding in *Corban*). The court in *Corban* reached this holding based on its interpretation of the meaning of "loss" and its rejection of the ACC clause's "in any sequence" language.  The court held "that loss occurs at that point in time when the insured suffers deprivation of, physical damage to, or destruction of the property insured." *Corban*, 20 So. 3d at 613.  In other words, a covered loss occurs the moment a covered peril causes damage, regardless of later damage by an excluded peril.  Because the policy provided a right to indemnity at the time of loss, the court held that the ACC

11

clause "may not be used to [divest] the insureds of their right to be indemnified for covered losses" because it would conflict with the policy's terms that provided that the right to indemnity vests at the time of loss. *Id.* at 615. As a result, the court held that the ACC clause's "in any sequence" language was ambiguous and read it out of the policy.

Despite the Fifth Circuit's recognition of the Mississippi Supreme Court's different interpretation of ACC clauses in *Corban*, the Fifth Circuit's decisions in *Leonard* and *Tuepker*, even though arising under Mississippi law, live on in the Circuit's consideration of ACC clauses arising under Louisiana law. *See, e.g.*, *Stewart Enterprises, Inc. v. RSUI Indem. Co.*, 614 F.3d 117 (5th Cir. 2010) (applying *Leonard* and *Tuepker* to a case arising under Louisiana law); Arctic *Slope Regional Corp. v. Affiliated FM Ins. Co.*, 565 F.3d 707 (5th Cir. 2009) (same). Still, the Louisiana Fourth Circuit, in *Orleans Parish School Bd. v. Lexington Ins.*, recently adopted the Mississippi Supreme Court's intepretation of ACC clauses. 123 So. 3d 787 (La. App. 4 Cir. Aug. 28, 2013). There, the court held that "ACC clauses do not operate to remove from coverage, damages that would have otherwise been covered as a result of the initially covered loss." *Id.* at 803. The court, citing the Mississippi Supreme Court's decision in *Corban*, further stated:

> [I]t cannot be seriously disputed that if a covered peril causes damages, coverage for that damage "is not changed

12

> by any subsequent cause or event." As the *Corban* court
> succinctly stated, "Nor can the loss be excluded after it
> has been suffered, as the right to be indemnified for a
> loss caused by a covered peril attaches at that point in
> time when the insured suffers deprivation of, physical
> damage to, or destruction of the property insured." We
> agree with that court's conclusion that ACC language such
> as "the loss is excluded regardless of any other cause or
> event contributing concurrently or in any sequence to the
> loss" cannot be used to divest an insured of their right
> to be indemnified for covered losses.

*Id.* (citations omitted). The court stated "that a factual
determination must be made regarding whether the damages ultimately
suffered by an insured are attributed to an initially covered loss,
or whether the damages are more properly attributed to" an excluded
peril. *Id.*

Because the Louisiana Supreme Court has not squarely addressed
the correct application of ACC clauses under Louisiana law, and
Louisiana appellate courts have not formed a clear consensus on the
issue, the Court instructed the jury under the Fifth Circuit's
precedent. *See F.D.I.C. v. Abraham*, 137 F.3d 264, 269 (5th Cir.
1998) (instructing that circuit precedent should not be discarded
on the basis of a single superseding state appellate court
decision). Accordingly, the Court instructed the jury, in relevant
part,

> [u]nder Louisiana Law, GeoVera bears the burden of
> proving the applicability of any exclusionary clause
> contained in its insurance policy by a preponderance of
> the evidence. GeoVera must show what damage was caused
> by the excluded peril. If you find that GeoVera has met
> its burden of proving by a preponderance of the evidence
> that the property damage claimed by the Arcements was
> cased by an excluded peril, such as flooding, then

> GeoVera is not liable to the Arcements for damages under
> the policy.  If you find that GeoVera has met its burden
> of proving by a preponderance of the evidence that any
> portion of the Arcements' property was damaged by an
> excluded peril, such as flooding, even if it was also
> damaged by a covered peril such as wind or rain, then
> GeoVera is not liable to the Arcements for damage to that
> portion of their property.

At trial, neither party objected to this instruction.

### iii. Defendant is Not Entitled to Judgment as a Matter of Law

Under Louisiana law, the insured has the burden to prove that the claim asserted is covered by the policy. *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 295 (5th Cir. 2009) (citations omitted).  If the insured meets this burden, the insurer then has the burden to prove that the damage at issue is excluded from coverage. *Id.*  Here, if the Arcements proved that their property sustained damage from wind and rain, the burden then shifted to GeoVera to prove that flooding also caused, concurrently or in any sequence, the damage at issue. *See id.*

As in *Leonard*, here, there are three species of damage: (1) damage caused exclusively by wind and wind-driven rain; (2) damage caused by flood; and (3) damage caused by both wind and wind-driven rain and flood.  As the Fifth Circuit stated in *Leonard*, only damage caused exclusively by wind and wind-driven rain is recoverable.  All other damages are excluded by operation of the flood exclusion and the ACC clause.  Therefore, the question is whether there was sufficient evidence for a reasonable jury to find

14

that the Arcements sustained wind and rain damage, independently and apart from any flood damage, in the amount of $70,000 for the home, $10,000 for the contents, and $200 for the other structures.

The Court finds that there was sufficient evidence at trial to permit a reasonable jury to reach the verdict rendered in this case. First, a reasonable jury could have found that the Arcements met their burden to show that wind and rain caused damage to their property. Tracey Arcement's testimony provided the primary support for the Arcements' claim that their property sustained damage from wind and wind-driven rain. Arcement identified numerous areas of and items in his home that were damaged by wind and rain before the home was inundated by flood waters. Specifically, Arcement testified that wind tore open three holes in the roof from which rainwater entered. According to Arcement, rainwater also entered through the home's chimney and spilled out into the living room through the fireplace. Arcement explained that the rainwater damaged multiple ceilings, including in the master bedroom, walk-in closet, and master bathroom, and multiple areas of the home, including the master bedroom, a walk-in closet, the master bathroom, a hallway, his daughter's walk-in closet and bedroom, the utility room, the kitchen, the bar, and the living room. Arcement also testified that all contents listed in Plaintiffs' Exhibit 3, totaling an estimated replacement cost of $54,652, were soaked by rainwater and were unsalvageable before any flooding occurred. The

items were unsalvageable, Arcement explained, because areas of the home were not only wet from rainwater, but also covered in sheet rock, dirt, and, in some instances, insulation from the attic. Arcement also explained that by the time he decided to evacuate from his home, the ceiling in the master bedroom and bathroom had caved in under the weight of rainwater.

Finally, Arcement also explained that wind-blown items damaged several windows in the front of the house before any flooding. First, Arcement described observing a wind-driven garbage can break one of the home's picture windows.  According to Arcement, this caused several inches of water to collect on the floor in the home's dining room and bar area.  Second, Arcement testified that a wind-driven solar-paneled light cracked a different picture window.

The Arcements' expert, Don Kotter, also testified about the wind- and rain-related damages the property sustained.  Kotter is experienced in determining wind versus flood damage, and he was tendered and accepted at trial as an expert in assessing the type of damage after a storm and in construction costs.  Kotter explained that he estimated only those damages that occurred from wind and rain and before any flooding.  Kotter said that the areas and items that he found damaged before the flooding were already wet and unsalvageable, and the flooding did no additional damage.

Kotter spent much of his testimony discussing his damages

estimate.  First, according to Kotter, wind and wind-driven rain damaged the home's roof, which caused $18,363.14 in damages. Second, Kotter estimated that rainwater caused $2783.25 in damages to the master bathroom.  Kotter based his estimate on the cost to replace approximately half of the dry wall, and paint a little more than half of the walls and ceiling.  Third, based on the proximity of the following areas to the holes in the roof, Kotter estimated that the following damages resulted from wind and rain: $10,223.95 for the master bedroom, $3429.29 for the master closet, $5153.52 for the laundry room, $1686.83 for a hallway, $19,562.16 for the kitchen, breakfast area, hallway, and dining area, $7994.85 for the living room,[10] and $3479.58 for the daughter's walk-in closet. According to Kotter, the attic also sustained $4405.73 in wind and rain damages, which included $3090.42 to replace the insulation and $1315.31 to apply anti-microbial agent to the roof decking rafters and joist.  Kotter also explained that the HVAC system's duct work sustained rain damage in the amount of $5473.16, and that the electrical system needed to be tested for water damage, which would cost $719.60.

Kotter also assessed the damages to other structures on the property.  Specifically, Kotter estimated that the carport sustained $1,090.21 in wind damage as evidenced by dents left by

---

[10]    This figure also includes damage resulting from rainwater entering through one of the broken windows.

wind-driven objects on the roof and siding.  The pool, according to Kotter, needed cleaning and servicing in the amount of $726.32 as a result of wind-driven debris and power loss.  Kotter further testified that the fence sustained wind damage in the amount of $3849.47.  Finally, Kotter stated that the garage sustained $2459.08 in damage to the roof and $175.45 in damage to a window caused by wind-drive debris.

As for contents damage, Kotter testified that his estimate for personal property damaged by wind and rain, $54,652, was based on the list compiled by the Arcements specifying items damaged by wind and rain.

With the addition of general construction costs ($11,665.79), mold remediation ($10,000), tax (roughly $8000), overhead (roughly $10,700), and profit ($10,715.51), Kotter's estimate came to $198,018.13 for replacement cost value, or $178,451.38 for actual cash value for damages caused by wind and rain.

GeoVera's engineering expert, Tony Clark, agreed that the roof sustained wind damage, which would have allowed the intrusion of rainwater before any flooding occurred.  Specifically, Clark estimated that up to 100 gallons of rainwater could have entered the home through the wind-created holes over a three-day period.[11]

---

[11]    From Clark's testimony, it was unclear if his estimate included rainwater that entered the home only before the flooding, or both before and after the flooding.  Clark originally indicated that the estimate included the entry of rainwater both before and after the flooding, but, on cross-

According to Clark, the rainwater would have caused the insulation, ceilings, walls, and furniture to become wet. Clark further opined that the following areas were likely impacted by rainwater: the master bedroom, the master closet, a hallway, the living room, the kitchen, and the laundry room. Clark also confirmed that the broken windows in the home and garage were caused by wind-driven objects and were unsalvageable prior to the flooding. Further, while Clark originally testified that he observed no wind damage to the fence, on cross-examination he testified that portions of the fence may have been missing and that the fence had separated joints likely attributable to wind.

GeoVera had the burden to show that the Arcements' damages were also caused concurrently or in any sequence by flooding. It is true that GeoVera called as witnesses Clark, its engineering expert, and Fred Renfro and Vern Abram, its adjustors, who testified that the interior of plaintiffs' home was inundated and damaged by flood waters.[12] But the jury could have accepted the testimony of Arcement and Kotter regarding pre-flooding wind and rain damages, especially as the testimony was partially supported

---

examination, he appeared to concede that the 100 gallons of rainwater could have entered before the flooding.

[12] GeoVera also argues that the proof of loss signed by the Arcements in relation to their flood insurance claim constitutes an admission that flooding caused all of their damages. The flood adjustor, Stratton, however, testified that the proof of loss indicated only that flooding caused the *covered* damages, not all damages.

by that of GeoVera's own expert, Clark.  Both Arcement and Kotter testified that rain and wind damaged the property and rendered numerous areas and items unsalvageable before any flooding.  For example, both stated that the ceilings had collapsed in multiple areas of the home, and that the sheet rock was already wet and unsalvageable in the affected areas.  Similarly, Arcement identified several windows damaged by wind-driven objects before the flooding.  GeoVera's expert, Clark, agreed that the windows were rendered unsalvageable before any flooding.  Further, Arcement testified that the contents in a list, totaling $54,653, were rendered unsalvageable by rainwater mixed with debris from the home.  As to the other structures, Kotter testified that the fence was damaged by wind, independently of any flooding, and that several other structures, including the garage, were damaged by wind-driven objects, again, independently of any flooding.  While GeoVera's witnesses all testified that the property was primarily damaged by flooding, Clark, GeoVera's engineering expert, stated that multiple areas of the home would have been damaged by pre-flooding wind and rain.  Finally, the flood adjustor, Christopher Stratton, testified that the home could have sustained substantial pre-flooding wind and rain damage.

A reasonable jury could have found that GeoVera failed to prove that the flood exclusion and ACC clause applied to exclude all of the Arcements' damages.  At trial, GeoVera introduced

20

uncontroverted evidence that flood waters inundated almost the entire property. But GeoVera's case appeared to rely primarily on its attempt to show that *all* damages were caused by flooding and that *none* of the wind and rain damages Arcement and Kotter reported occurred. As a result, GeoVera presented little evidence on the issue of whether the later flooding inflicted any damage on areas and items Arcement and Kotter identified as unsalvageable before the flooding. For example, GeoVera did not even present any evidence showing that the collapsed ceilings, which no longer functioned as ceilings, were or could have been further damaged by flood water. Instead, GeoVera sought to show that the ceilings did not collapse before the flooding, and that the flooding caused the ceilings to collapse. Likewise, GeoVera did not present any evidence showing that the broken windows sustained additional damage from flooding. While the jury could have inferred that the later flooding caused additional damage to those items and areas Arcement and Kotter identified as unsalvageable before any flooding, the jury was not required to make this inference. As a result, the jury could have reasonably concluded that the areas and items identified by Arcement and Kotter as irretrievably damaged by wind and rain sustained no damage as a result of the flooding.

That the jury awarded much less in damages than the Arcements sought also indicates that the jury followed the Court's instructions. The Arcements requested roughly $127,000 for their

home, $59,000 for their contents, and $10,000 for their other structures.  In comparison, the jury only awarded $70,000 for the home, $10,000 for contents, and $200 for other structures.  This shows that the jury was able to segregate those damages it attributed exclusively to wind or rain and those to which flooding contributed.  Ultimately, given the evidence presented at trial, the Court has no reason to assume the jury failed to follow the instructions.

Accordingly, GeoVera's motion for judgment as a matter of law on this issue is denied.

### 2. Award of Damages under La. Rev. Stat. § 22:1973(B)(6)

GeoVera additionally moves for judgment as a matter of law on the question of penalties.  Louisiana law authorizes the recovery of bad faith penalties from insurers who fail to pay legitimate claims.  *See* La. Rev. Stat. §§ 22:1982, 22:1973.  Under Section 22:1973(B)(6), an insurer is in bad faith for "[f]ailing to pay claims pursuant to R.S. 22:1983 when such failure is arbitrary, capricious, or without probable cause."  Section 22:1983(A)(1) provides: "No insurer shall use the floodwater mark on a covered structure without considering other evidence, when determining whether a loss is covered or not covered under a homeowners' insurance policy."  La. Rev. Stat. § 22:1983(A)(1).  To recover under Section 22:1973, the plaintiff must demonstrate that the insurer (1) received a satisfactory proof of loss, (2) that the

22

insurer failed to pay within the designated time period, and (3) that the failure to pay was arbitrary, capricious or without probable cause. *See Boudreaux v. State Farm Mutual Automobile Ins.*, 896 So. 2d 230, 233 (La. App. 4 Cir. Feb. 2, 2005). At trial, the jury awarded $5000 in penalties under Section 22:1973(B)(6) based on its finding that GeoVera used only the flood water mark, without considering other evidence, in determining coverage.

GeoVera now argues that there was insufficient evidence for the jury to conclude that it relied only on the flood water mark. While there was evidence at trial suggesting GeoVera looked to other evidence, such as photographs or its adjustors' overall examinations of the dwelling, there was also evidence suggesting that it relied primarily--or exclusively--on the flood water mark in determining whether to provide coverage.

Tracy Arcement testified that GeoVera's first adjustor, Renfro, was interested only in examining the flood line. According to Arcement, Renfro stated that GeoVera would not pay for any damages below the flood line. Arcement testified further that GeoVera's second adjustor, Abram, was not interested in hearing Arcement's account and that he too was mainly interested in measuring the flood line. According to Arcement, GeoVera claimed it was not responsible for any damage below the flood line as evidenced by a letter the Arcements received from GeoVera, which

23

stated that there was no coverage for damages below the flood line.[13]  Arcement explained that GeoVera gave no other reason for denying coverage.

Although GeoVera's claims supervisor and its adjustors denied relying exclusively on the flood line in assessing damage, GeoVera's claim file provided support for the proposition that GeoVera relied solely on the flood line.  For example, the report prepared by the adjustor, Abram, states: "No interior damages were adjusted or estimated due to floodwater being over the ceiling height."[14]  Likewise, the report prepared by the other adjustor, Renfro, states: "Scoped and measured interior rooms; did not include in estimate; as flood debris was above ceiling joist."[15]  These records are consistent with the September 29, 2012 letter from GeoVera, which states that "there is no coverage for the damages claimed below the flood line."[16]  Another letter from GeoVera, dated October 15, 2012, states that coverage was denied on reinspection because the "items were either below the flood

---

[13]   The letter, dated September 29, 2012, and signed by Kiara Rainey, a claims adjustor for GeoVera, states: "Unfortunately, based on the circumstances of the loss it has been determined that there is no coverage for the damages claimed below the flood line." Plaintiffs' Ex. 10 at 017-100.

[14]   Plaintiffs' Ex. 10 at 017-008.

[15]   *Id.* at 017-028.

[16]   *Id.* at 017-100.

24

line/water line of 11ft 2 in, or not visually damaged."[17]  This language suggests that the presence of an item below the flood line alone could exclude it from coverage.

The jury was entitled to find Arcement's testimony and GeoVera's documents more credible than GeoVera's witnesses.  This is not a case where the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable jurors could not arrive at a different verdict.  A jury could have reasonably found that GeoVera relied exclusively on the flood line in denying coverage.  The Court therefore finds that the evidence was sufficient to support the jury's verdict.

Accordingly, GeoVera's motion for judgment as a matter of law on this issue is denied.


**B. Motion to Amend the Judgment**

GeoVera moves in the alternative for the Court to amend the judgment to reduce the award of the jury for dwelling damages from $70,000.00 to $69,448.89 to reflect a proper replacement cost value calculation.  In essence, GeoVera argues that the jury's award allows the Arcements double recovery in the amount of $551.11.

Under Louisiana law, an insured may "recover under all available coverages provided that there is no double recovery." *Cole v. Celotex*, 599 So. 2d 1058, 1080 (La. 1992) (quoting 15A

---

[17]    *Id.* at 017-095.

25

*Couch on Insurance* § 56:34 (2d ed. 1983)).  Accordingly, "while an insured may not recover in excess of his actual loss, an insured may recover under each policy providing coverage until the total loss sustained is indemnified." *Id.* (quoting Appleman, *Insurance Law and Practice* § 5192 (1981)).  Actual loss can be "measured by the cost of repair, replacement, or [actual cash value]--depending on the circumstances of [the] case." *Bradley v. Allstate Ins.*, 620 F.3d 509, 522 (5th Cir. 2010).

Here, the Court instructed the jury that the Arcements could recover either replacement cost value--if replacement costs have been or will be incurred and the Arcements provided notice to GeoVera within 180 days of the date of loss that they intended to repair or replace--or, otherwise, actual cash value. *See Bradley*, 620 F.3d at 522 (noting that "the proper measure of actual loss" is a question of fact).  Outside the presence of the jury, the Court instructed the parties that it would correct any award of damages in excess of the maximum amount recoverable.

The parties agree that the jury awarded damages based on replacement cost value, as opposed to actual cash value.[18]  GeoVera contends, however, that the jury's award of $70,000 for dwelling damages exceeds the maximum recoverable replacement cost value, and that the award should be reduced by $551.11.  Specifically, GeoVera asserts that the maximum recoverable replacement cost value for the

---

[18]    *See* R. Docs. 58-1 at 8 & 63 at 18.

dwelling is $69,448.89.  GeoVera reaches this figure by using the pre-storm replacement value of the home of $331,360.46, as determined by the flood adjustor, Stratton, and deducting $250,000, the amount the Arcements received for structure damages from their flood insurer, and $11,911.57, the amount of coverage provided by GeoVera.   In contrast, the Arcements arrive at a maximum recoverable replacement cost value by using $350,636 as the replacement cost of the dwelling and other structures,[19] and deducting the $250,000 flood insurance payment to arrive at a figure of $100,638.[20]

To determine the maximum amount the Arcements can recover for damage to their dwelling and other structures, the Court must consider: (1) the amount already recovered on flood insurance, (2) the amount already paid under GeoVera's policy, (3) the amount of damages attributable to covered wind and/or rain loss, and (4) the total loss sustained.  If the sum of figures (1) through (3) does not exceed (4), the award is appropriate.  If the amount recovered exceeds the total loss, however, the Court will reduce the jury's

---

[19]    The figure the Arcements use incorporates damages to both the dwelling and other structures, but, here, GeoVera challenges only the jury's award for damages to the dwelling.  As a result, the Arcements' use of this figure is unwarranted.

[20]    The Arcements' calculation does not include the $11,911.57 in GeoVera coverage as a deduction.  They provide no explanation for this, and the Court is aware of no reason why the coverage GeoVera provided should not be deducted in making this calculation.

award to prevent double recovery.

First, as to figure (1)--the amount already recovered on flood insurance, evidence at trial showed that the Arcements recovered $250,000 from their flood insurer for damages to their dwelling.[21] Second, evidence at trial showed that as to figure (2)--the amount already paid under GeoVera's policy, that GeoVera provided $11,911.57 in coverage. Third, the jury determined that the amount of damages attributable to covered wind and/or rain loss, figure (3), was $70,000.[22] Together, this totals $331,911.57. Finally, evidence at trial showed that the maximum total loss the Arcements sustained to their dwelling and other structures was $331,360.46, as shown by Stratton's estimates.

Given these figures, the Court finds that the jury award exceeds the maximum amount recoverable for the Arcements' dwelling by $551.11. Accordingly, GeoVera's motion to amend the judgment is granted. The jury's award for damages to the dwelling is amended from $70,000 to $69,448.89.

---

[21]    While the flood adjustor, Christopher Stratton, testified that the flood insurance provided coverage for other structures under the dwelling coverage, he also testified that the entire $250,000 payment, the policy's limit, was paid solely for damages to the dwelling. He explained that damage to the other structures was not included in his assessment because the damage to the dwelling alone was sufficient to exhaust the policy's coverage. As a result, the Court deducts the $250,000 flood insurance payment from the damage to the dwelling alone.

[22]    R. Doc. 51-1.

**IV. Conclusion**

For the foregoing reasons, the Court DENIES the motion for judgment as a matter of law, and GRANTS the motion to amend the judgment.


New Orleans, Louisiana, this 12th day of January, 2015.


_____
SARAH S. VANCE

UNITED STATES DISTRICT JUDGE